UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT SADLER, #147503,

Plaintiff,

v.

MICHIGAN DEPARTMENT OF CORRECTIONS, THOMAS K. BELL, VIRGIL WEBB, ARUS MONAHAN, RUM D. ANDISON, OFFICER TERRILL, and OFFICER GALLUP,

Defendants.
_______________________________/

CIVIL ACTION NO. 09-11375

DISTRICT JUDGE AVERN COHN

MAGISTRATE JUDGE MARK A. RANDON

**REPORT AND RECOMMENDATION ON DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT (DKT. NO. 55)**

## I. INTRODUCTION AND PROCEDURAL HISTORY

This is a prisoner civil rights action brought under 42 U.S.C. § 1983. Proceeding *pro se*, Plaintiff Robert Sadler filed a fifteen count complaint alleging that the Michigan Department of Corrections ("MDOC") and several staff members at the Gus Harrison Correctional Facility ("ARF") violated his rights under the First and Eighth Amendments to the United States Constitution and the Americans With Disabilities Act ("ADA").

On April 28, 2009, District Judge Anna Diggs Taylor dismissed Plaintiff's claims against the MDOC, Thomas Bell and Virgil Webb for failure to state a claim. (Dkt. No. 4) This left Sandra Monahan ("Monahan"), Willis Terrill ("Terrill"), Randy Gallup ("Gallup") (collectively referred to

as "Defendants") and D. Andison[1] as the remaining defendants. Defendants subsequently filed their first motion for summary judgment. On February 2, 2010, Judge Taylor adopted the undersigned's report and recommendation regarding the motion, and Plaintiff's complaint was distilled to include *only* the following five claims:

1. Plaintiff's claim that Monahan denied him a properly ventilated cell while in the Administrative Segregation Unit ("ADSEG").

2. Plaintiff's claim that Terrill was deliberately indifferent to his medical needs by hiding his wheelchair.

3. Plaintiff's claim that Gallup and Terrill were involved in a contraband razor blade being placed in his wheelchair.

4. Plaintiff's claim that Gallup retaliated against him by confiscating prisoner appliances telling the prisoners he was doing so because "plaintiff writes grievances."

5. Plaintiff's claim that Gallup and Terrill conspired to violate his constitutional rights as set forth above.

(Dkt. No. 28). The parties were then permitted to engage in a period of discovery limited to these claims, which – after a 90 day extension – closed on September 30, 2010. (Dkt. No. 47)

This matter comes before the Court on Defendants' second motion for summary judgment (Dkt. No. 55), filed after the close of discovery. Defendants now seek dismissal of Plaintiff's remaining five claims arguing that they "are either meritless or simply untrue" (*id.* at p. 2). Plaintiff has filed a timely response to the motion (Dkt. No. 68) and the undersigned dispenses with oral argument pursuant to E.D. Mich. LR 7.1(e)(1). For the reasons indicated below, **IT IS RECOMMENDED** that Defendants' motion be **GRANTED-IN-PART** and **DENIED-IN-PART.**

---

[1] To date, Defendant Andison has not been served. A recommendation as to Andison follows at Section III(G), *infra*.

Defendants' motion should be **GRANTED** with respect to the following three of Plaintiff's remaining claims:

> Plaintiff's claim that Terrill was deliberately indifferent to his medical needs by hiding his wheelchair.
>
> Plaintiff's claim that Gallup and Terrill were involved in a contraband razor blade being placed in his wheelchair, and
>
> Plaintiff's claim that Gallup and Terrill conspired to violate his constitutional rights.

However, the motion should be **DENIED** as to the following two claims:

> Plaintiff's claim that Monahan denied him a properly ventilated cell while in the Administrative Segregation Unit ("ADSEG"), and
>
> Plaintiff's claim that Gallup retaliated against him by confiscating prisoner appliances telling the prisoners he was doing so because "plaintiff writes grievances."

Therefore, should this recommendation be adopted, Terrill and Andison would be dismissed as parties, and Plaintiff would be permitted to proceed against Monahan and Gallup only, limited to the two claims above.

## II. FACTS

Plaintiff has been serving a life sentence in the custody of the MDOC since 1984. At all relevant times, he has been housed at ARF, located in Adrian, Michigan. Plaintiff is disabled and – to travel distances – uses a wheelchair to move about the facility. (Dkt. No. 1, ¶ 12 and Dkt. No. 24, Ex. G-H) Plaintiff is also a diabetic and requires insulin on a daily basis; he has been medically documented as being at risk for a heat related illness since October 26, 2007. (Dkt. No. 24, p. 41 (Ex. G)) Plaintiff additionally claims to have heart disease and need of special shoes and a walking cane. (Dkt. No. 1, ¶ 12)

Defendants are staff members at ARF. Monahan is the Assistant Resident Unit Supervisor ("ARUS") while Terrill and Gallup serve as Resident Unit Officers ("RUO"). D. Andison ("Andison") is the Resident Unit Manager ("RUM"). Plaintiff's Complaint alleges that on January 1, 2008, he filed a grievance against Andison for violating his constitutional rights during an administrative hearing regarding Plaintiff's personal property. Plaintiff claims that this grievance precipitated a wide range of individual and conspired retaliatory and discriminatory conduct by Defendants, which forms the basis of his lawsuit. Plaintiff's Complaint seeks monetary damages and injunctive relief.

### *A.* Plaintiff's Five Remaining Claims

#### *1. The Hiding of the Wheelchair Claim*

According to Plaintiff, on March 6, 2008, Terrill took Plaintiff's wheelchair and hid it in another room. (Dkt. No. 1, ¶15) This prevented Plaintiff from going to take his insulin medication and getting to the dining area for his evening meal. Plaintiff does not deny leaving his wheelchair unattended, but he alleges that Terrill intentionally hid it, knowing Plaintiff was a diabetic and would likely suffer physical harm as a result. (Dkt. No. 1, ¶ 15)

Terrill admits that he moved Plaintiff's wheelchair, which, he contends, had been left unattended near the mailboxes and food line and was impeding prisoner movement in the unit. (Dkt. No. 11, Ex. B) Terrill moved the wheelchair to a back room. He claims to have had no idea to whom the wheelchair belonged and says that he routinely moves wheelchairs found unattended on the unit. *Id.* When time becomes available, he tracks down the person to whom the wheelchair belongs. In this instance, Plaintiff's assigned prisoner-assistant, Larry Hoyt, later approached Terrill and asked him the whereabouts of Plaintiff's wheelchair. *Id.* Terrill walked Hoyt to the room where

it was and asked him why the wheelchair was left unattended on the unit. Hoyt responded that Plaintiff had told him to leave it there and that he (Plaintiff) would retrieve the chair *after* his meal. (Dkt. No. 11, Ex B, ¶¶1-5)

Hoyt's affidavit acknowledges that Plaintiff's wheelchair was left unattended in the hallway and that Hoyt did not believe that the wheelchair had Plaintiff's name on it or could otherwise be identified as belonging to Plaintiff. Hoyt also avers that Plaintiff was able to "walk certain distances without the use of his wheelchair" and that Terrill returned the wheelchair to Plaintiff within 30 minutes. (Dkt. No. 55-8, ¶¶ 3-6)

Plaintiff grieved the wheelchair incident. The Warden's Step II grievance response indicated that Plaintiff had no authority to leave his wheelchair where he had and that Terrill's action of moving the wheelchair was in compliance with fire safety regulations. Plaintiff's Step III grievance appeal was similarly denied. (Dkt. No. 11, Ex. A)

### *2. The Planted Razor Blade Claim*

Plaintiff alleges that, on or about September 17, 2008, Terrill along with Gallup's co-workers (including Terrill's son CO Lennox) were working "the one block housing unit where. . .[Plaintiff] had been reassigned" when "someone" placed a contraband razor blade in Plaintiff's wheelchair, for which Plaintiff was falsely charged. (Dkt. No. 24 - Pl. Aff. ¶ 6) Plaintiff theorizes that this false charge was orchestrated by Gallup and Terrill with the help of their co-workers. (Dkt. No.1, ¶ 25) The charges for possession of the razor blade were sustained and

Plaintiff was placed in ADSEG (administrative segregation).[2] (Dkt. No. 1, ¶ 26 and Dkt. No. 24 - Pl. Aff. ¶ 7)

In support of this claim, Plaintiff has obtained sworn statements from three prisoners. Two of them, Diggs and Smith, state that Terrill has made false weapons charges against them or other prisoners in the past. (Dkt. No. 24, Ex. C and D) However, neither Diggs nor Smith express any knowledge of the specific incident involving the razor blade found in or about Plaintiff's wheelchair in September of 2008. The third inmate, Coker, states that he was in "Housing Unit One the day Sadler was set-up with a razor blade in his wheelchair," and that he is prepared to testify that "Norden, Terrill and Lennox were "involved" in the incident. (Dkt. No. 68, Ex. 1) However, Coker's statement provides no details about the incident or the nature of Terrill's alleged involvement. *Id.*

***3. The Denial of a Properly Ventilated Cell Claim***

As mentioned above, Plaintiff was placed in ADSEG for possession of the razor blade and remained there from September 27 until October 26, 2008. Plaintiff alleges that despite his claims to Monahan and other ARF staff members, Monahan refused to turn on the fans when the "heat index exceeded 90º Fahrenheit." (Dkt. No. 1, ¶ 27 Dkt. No. 68, p. 5) Monahan responds that she was aware of Plaintiff's "multiple medical problems" but denies that Plaintiff's cell in ADSEG had inadequate ventilation. (Dkt. No. 55-9, ¶6) According to a weather report from the National Climate Data Center (provided by Defendants), during Plaintiff's time in ADSEG, the high temperature in Adrian, Michigan reached 80 degrees Farenheit on only one occasion – October 13, 2008. *Id.* at ¶7.

[2] Monahan correctly notes that ARF does not have an ADSEG unit but does have "punitive detention cells." However, to avoid confusion, "ADSEG" (the term used by Plaintiff) will be used in this Report and Recommendation.

Plaintiff insists that the weather report is inauthentic, and further that it does not document the "heat index," which takes humidity levels into account. (Dkt. No. 68, p.4) He also claims that his cell in ADSEG "was in direct point of the sun. . . making it hotter than actually [sic] outdoor temperatures." *Id.*

### *4. The Retaliation Claim*

On March 30, 2008, Gallup found a tobacco can with ashes and cigarette butts in Plaintiff's cell in the course of a routine cell search. Terrill issued a Minor Misconduct charge against Plaintiff for violating posted rules prohibiting smoking in the unit. Plaintiff was found guilty of the charge, on April 3, 2008, and was sanctioned with 5 days "Toplock" and 15 days "Loss of Privileges" ("LOP"). (Dkt. No. 11, Ex. D). Terrill also charged Plaintiff with "Insolence/Sexual Misconduct" after Plaintiff yelled vulgar, profane and sexually charged statements at him when he was making rounds. Plaintiff was found guilty of the Insolence charge and not guilty of the Sexual Misconduct, with the administrative hearing officer concluding that the string of comments was essentially one act of insolence. On April 4, 2003, Plaintiff was sanctioned with another 14 days "Loss of Privileges" ("LOP"). (Dkt. No. 11 Ex. E and E(1))

Plaintiff alleges that on April 3, 2008, Gallup went through the housing unit and confiscated appliances from prisoners with LOP sanctions (including Plaintiff) telling them he was doing so because "Plaintiff writes grievances." (Dkt. No. 1, ¶ 21) Gallop argues that Plaintiff violated the LOP sanction, imposed on him earlier that day; he was collecting appliances from all prisoners serving LOP sanctions and found three bags of tobacco and one bag of rolled cigarettes in Plaintiff's area of control. Gallup, therefore, charged Plaintiff with a major misconduct for being in violation of his LOP sanction. Plaintiff was found guilty of the charge on April 23, 2008 (Dkt. No. 11 Exs

F and F(1) and Ex G at ¶¶ 5 and 7; also see Dkt. No. 1, ¶ 24), and his grievance objecting to the violation was rejected as an improper attempt to challenge his administrative hearing decision. (Dkt. No. 11 Ex. F(2), MDOC Grievance ARF-2008-04-580-27A ("580"))

In support of his claim, Plaintiff has provided an affidavit from Emerson Ritchie, a prisoner at ARF. (Dkt. No. 24, p. 39) Ritchie states that on April 3, 2008, he heard Gallup "tell the inmate in 132B/3 Blk. That the reason he [Gallup] was taking his [the inmate's] television and tape player was because inmate Sadler wrote a grievance." *Id.* At the time, Ritchie apparently occupied a nearby cell (131A). *Id.*

#### *5. The Conspiracy Claims*

With respect to his five remaining claims, Plaintiff's complaint alleges a conspiracy between Terrill and Gallup to: (1) discriminate against Plaintiff by hiding his wheelchair; (2) retaliate against Plaintiff; and (3) concoct major rule infractions knowing sanctions would be imposed. (Dkt. No. 1, ¶ 46)

## III. ANALYSIS

### A. Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3rd Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. If the moving party can make such a showing, then the burden shifts to the nonmoving party to present evidence that a genuine fact issue exists and a trial is necessary. *Id.* at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. *Id.* at 251-52.

**B. Removal of the Wheelchair was not Deliberately Indifferent**

Plaintiff's allegation that Terrill was deliberately indifferent to Plaintiff's medical needs by hiding his wheelchair is analyzed under the Eighth Amendment. See *Estelle v. Gamble*, 429 U.S. 97, 103-104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To state a § 1983 claim for violation of a prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). To succeed on a claim of deliberate indifference, Plaintiff must satisfy two elements, an objective one and a subjective one. *Wilson*, 501 U.S. at 300. The objective element is satisfied by

a showing that Plaintiff had a serious medical need. *Wilson,* 501 U.S. at 297; *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). "To satisfy the subjective component, Plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to Plaintiff, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), citing *Farmer*, 511 U.S. at 837. Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 333-34 (1986). Instead, deliberate indifference is characterized by obduracy and wantonness, not inadvertence or good faith error. *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992).

A reasonable jury would not conclude that Terrill's conduct in removing Plaintiff's unattended wheelchair from the hallway was deliberately indifferent. While Plaintiff's medical need to receive his insulin shot for his diabetes and receive his evening meal was arguably serious, Plaintiff has failed to allege or demonstrate that Terrill was aware that the wheelchair was being used by, or belonged to, Plaintiff. There is no dispute that the wheelchair was unattended, and there is no evidence that Plaintiff's name was on the wheelchair. (Dkt. No. 55-8) Plaintiff has submitted an affidavit from prisoner R. Maclin which states that, at the time, "all the wheel chairs had the prisoner inmate number on the back of each chair." (Dkt. No. 24, Ex. B, p. 34) However, *Plaintiff* has not alleged that the wheelchair contained any information by which it could be identified as being used

by him. Further, assuming Maclin's general allegation that *all* wheelchairs had prisoner identification numbers is true, there is no allegation that Terrill knew Plaintiff's prisoner number.

There is another good reason why Terrill's conduct was not deliberately indifferent. According to Plaintiff's prisoner-assistant, Hoyt, Plaintiff's wheelchair was returned to him within 30 minutes. Plaintiff does not dispute that he was without his wheelchair "for less than one hour." (Dkt. No. 68, p. 6) Nor does Plaintiff allege that he did not receive his meal or get his insulin shot as a result of being without his wheelchair. Rather, Plaintiff's allegation is that Terrill's intent in "hiding" his wheelchair was to prevent him from getting his meal and insulin shot. Yet, Plaintiff fails to explain how the brief period of time without his wheelchair was – or even could have been – detrimental to his health.[3] Terrill's action in removing the wheelchair from the hallway was determined to be proper and in compliance with fire safety regulations. In sum, this apparently isolated incident, which lasted less than an hour and was consistent with fire safety regulations, cannot sustain a claim for deliberate indifference and should be dismissed.

**C. The Planted Razor Blade Claim should be Dismissed**

In an action brought under § 1983, a plaintiff must demonstrate the personal involvement of each defendant in the activity that forms the basis of the complaint. *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1948 (2009).

Here, Plaintiff's affidavit indicates only that on September 17, 2008 "*someone*" placed a razor blade in the wheelchair he was using. (Emphasis added) Neither of the three sworn prisoner statements provided by Plaintiff – in support of Plaintiff's claim that Terrill was one of the

---

[3] For example, there is no allegation that Plaintiff could not receive his shot at that time in the evening because of the less than hour he was without his wheelchair.

perpetrators – are sufficient to avoid summary judgment. Two of the prisoners, Diggs and Smith, state that Terrill has made false weapons charges against them or other prisoners in the past. (Dkt. No. 24, Ex. C and D) However, neither Diggs nor Smith express any knowledge of the specific incident involving the razor blade found in or about Plaintiff's wheelchair. The third inmate, Coker, states that he was in "Housing Unit One the day Sadler was set-up with a razor blade in his wheelchair," and that he is prepared to testify that "Norden, Terrill and Lennox were "involved" in the incident. (Dkt. No. 68, Ex. 1) However, Coker's statement provides no details about the incident or the nature of Terrill's alleged involvement. *Id.* Therefore, this claim should be dismissed as no reasonable jury could find that Terrill was personally involved in planting a razor blade in the wheelchair being used by Plaintiff.

**D. A Question of Fact Exists as to Whether Plaintiff was Denied a Properly Ventilated cell**

Plaintiff's claim that he was denied a properly ventilated cell is also analyzed under the Eighth Amendment deliberate indifference standard. Plaintiff claims that Monahan denied him a properly ventilated cell in ADSEG, knowing he was susceptible to heat-related illness, when the heat index exceeded 90 degrees. Monahan admits that she was aware of Plaintiff's "multiple medical problems" but denies that Plaintiff's cell in ADSEG had inadequate ventilation. (Dkt. No. 55-9, ¶6) . Significantly, Monahan's affidavit does not deny that she was aware of the multiple complaints about the heat condition Plaintiff alleges he made while in ADSEG. Instead, Monahan relies on weather report from the National Climate Data Center ("NCDC"). The NCDC report indicates that during Plaintiff's time in ADSEG (September 27 until October 26, 2008) the high temperature in

Adrian, Michigan reached 80 degrees Fahrenheit on only one occasion – October 13, 2008.[4] *Id*. at ¶7. Plaintiff argues that the NCDC report does not report the "heat index," which takes humidity levels into account. (Dkt. No. 68, p.4) He also claims that his cell in ADSEG "was in direct point of the sun. . . making it hotter than actually [sic] outdoor temperatures." *Id.* These points are well-taken.

The National Oceanic and Atmospheric Administration's ("NOAA") National Weather Service has issued a Heat Index Chart.[5] The chart measures the heat index: a measure (given in degrees Fahrenheit) of how hot it really feels when relative humidity is factored with the actual air temperature. The NOAA's heat alert procedures (indicating the "likelihood of heat disorders with prolonged exposure or strenuous activity") are based mainly on these Heat Index Values. The chart begins with an air temperature of 80 degrees Fahrenheit and a relative humidity of 40 percent. This results in a heat index of 80 degrees Fahrenheit – and a designation of "caution."[6] Notably, an air temperature of 80 degrees Fahrenheit can result in a heat index range of between 80 and 87 degrees Fahrenheit, depending on the relative humidity levels. The chart also advises that "since heat index values were devised for shady, light wind conditions, exposure to full sunshine can raise heat index

---

[4] According to the NCDC report the air temperature was also relatively warm on other days during Plaintiff's stay in ADSEG: September 28, 2008 – 75 degrees; October 11, 2008 – 77 degrees; and October 12, 2008 – 79 degrees.

[5] Heat: A Major Killer, NOAA's National Weather Service, Office of Climate, Water, and Weather Services (last updated August 19, 2010), *available at* http://www.nws.noaa.gov/om/heat/index.shtml.

[6] A designation of "caution" is attributed to a heat index of between 80 to 89/90 degrees Fahrenheit; "extreme caution" between 91/92 and 100-103 degrees Fahrenheit; "danger" between 103-106 and 121-124 degrees Fahrenheit; and "extreme danger" 126-130 degrees Fahrenheit and above. *See*, note 4.

values by up to 15 [degrees Fahrenheit]." According to Plaintiff, at times, his cell was "so hot" that he required medical attention". (*See* Dkt. No. 55, Ex. C, pp. 143-145).

The undersigned takes judicial notice of the data presented in the NOAA's Heat Index Chart and the NCDC report. Fed R. Evid. 201. In doing so, and in viewing the facts and their reasonable inferences in a light most favorable to Plaintiff, the undersigned finds that a genuine issue of material facts exits as to whether Monahan was deliberately indifferent in not taking steps to address the alleged heat condition in Plaintiff's ADSEG cell. Monahan was aware of Plaintiff's multiple medical conditions - including a risk of heat-related illness; she does not deny being aware of his complaints about the heat conditions in his cell; and yet took no remedial action herself, or by notifying someone who could remedy the situation. Therefore, summary judgment on this issue would be inappropriate.[7]

**E. A Question of Fact Exists as to Plaintiff's Retaliation Claim**

A prisoner's First Amendment retaliation claim must contain three elements: (1) he was engaged in protected conduct; (2) the defendant took an adverse action against him; and (3) that there is a causal connection between the two (i.e., that the adverse action was motivated at least in part by the exercise of the constitutional right). *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc). An inmate engages in protected conduct when he files grievances and/or lawsuits. *Noble v. Schmidt*, 87 F.3d 157, 162 (6th Cir. 1996). An adverse act is an action capable of deterring a person

[7] Defendants have previously argued that Plaintiff failed to exhaust his administrative remedies (related to the heat condition in his cell), because his grievance was not filed until October 30, 2008 even though his stay in ADSEG began on September 17, 2008. Plaintiff's grievance was rejected as untimely even though he claimed that poor conditions existed throughout his stay in ADSEG and his *last* day there was October 26, 2008. Plaintiff appealed the rejection of his grievance through Step III. The undersigned find that a question of fact exists as to whether the grievance was timely filed.

of ordinary firmness from continuing to engage in that conduct. *Thaddeus-X*, 175 F.3d at 398. Moreover, Plaintiff has an evidentiary burden to establish that the allegedly retaliatory acts amounted to more than a *de minimis* injury. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002). As for the requisite causal connection, Defendants should be granted summary judgment where there are only bare allegations of malice. *Thaddeus-X*, 175 F.3d at 399.

Plaintiff filed at least three grievances during the time period of Gallup's allegedly retaliatory conduct – April 3, 2008. On January 1, 2008, Plaintiff alleges he filed a grievance against Andison for violating his constitutional rights during an administrative hearing. (Dkt. No. 1, ¶ 14) On or about March 6, 2008, Plaintiff filed a grievance against Terrill regarding the wheelchair incident "(Grievance Identifier Code No. ARF-200803-0390-17A)." *Id.* at ¶ 16. And, on March 30, 2008, Plaintiff filed a grievance against Terrill and Gallup for the following comments to him: "Let's get him [Plaintiff] now" and "You [Plaintiff] will be in the hole by the end of the week." Plaintiff provides an "Identifier Code Number" for this grievance: ARF-0803-00530-17A. *Id.* at ¶¶ 18-20. Just four days after filing the last grievance, Gallup made the alleged retaliatory comments, which were overheard by another prisoner.

Defendants argue Gallup's comment – that he was taking personal property from prisoners because Plaintiff "writes grievances" – was not retaliatory because Gallup acted pursuant to a direct order from his supervisor, and took property only from prisoners, such as Plaintiff, who were serving LOP sanctions. This argument is unpersuasive. Even though Gallup had a direct order and legitimate reason to confiscate prisoner property, if true, Gallup's decision to blame Plaintiff for the prisoners' loss of their property could reasonably be viewed by a jury as retaliatory. Therefore, this claim should not be dismissed.

**F. The Conspiracy Claims Should be Dismissed**

Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985. (Dkt. No. 1, ¶ 46) A claim under § 1985(3) requires the showing of a conspiracy to deprive Plaintiff of the equal protection of the laws, and an act in furtherance of the conspiracy that caused injury to Plaintiff. Further, Plaintiff must demonstrate that the conspiracy was motivated by a class based animus, such as race. *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998); *Johnson Hills and Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir., 1994), *cert. denied*, 514 U.S. 1066 (1995). And, there must be a predicate constitutional violation to support a claim of conspiracy under 42 U.S.C. § 1985. *Volunteer Medical Clinic, Inc., v. Operation Rescue*, 948 F.2d 218, 226 (6th Cir. 1991). However, not only has Plaintiff failed to make a showing of class-based *animus*, as discussed above, the underlying claims upon which his conspiracy allegations are based should be dismissed. *See Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 568-69 (6th Cir. 2002)(where the substantive allegations that form the basis of a conspiracy claim are properly dismissed, the conspiracy counts also fail.).

Moreover, whether proceeding under 42 U.S.C. § 1985 or for civil conspiracy under § 1983, a plaintiff must show some evidence of coordinated actions between the alleged conspirators. *See Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999); *Collyer v. Darling*, 98 F.3d 211, 229 (6th Cir. 1996). Conclusory or vague accusations that do not describe some "meeting of the minds" cannot state a claim for relief under 42 U.S.C. §§ 1983 or 1985. *See Naguib v. Illinois Dept. of Professional Regulation*, 986 F.Supp. 1082, 1092 (N.D. Ill. 1997); *Pollack v Nash*, 58 F.Supp.2d 294, 299-300 (S.D. NY. 1999). Regarding the two claims the undersigned recommends should survive, Terrill and Gallup's alleged involvement in the "ADSEG cell incident" and Terrill's alleged involvement in Gallup's conduct in confiscating prisoner property are at best tenuous. Plaintiff's

allegations are also conclusory and insufficient to establish a meeting of the minds. As such, the conspiracy claims should be dismissed.

**G. Andison Should be Dismissed for Non-Service**

In its Report and Recommendation of November 9, 2009, the undersigned advised Plaintiff that Andison had not been served. (Dkt. No. 26, p. 3) Plaintiff not raised the issue of Andison's lack of service since being notified of the lack of service.

Under Fed. R. Civ. P. 4(m), a defendant must be served within 120 days of filing the complaint. Here, defendant Andison has not been served and this case has been pending for over 120 days (since March 10, 2009); therefore, Andison should be dismissed without prejudice. *Mackall v. Doe*, No. 05-60083-AA, 2005 WL 1843449, *1 (E.D. Mich. July 29, 2005), citing *Awdish v. Pappas*, 159 F.Supp.2d 672, 673, n. 1 (E.D. Mich.2001), and *Johnson v. City of Ecorse*, 137 F.Supp.2d 886, 892 (E.D. Mich.2001). This Report will serve as notice to

Plaintiff under Rule 4(m).

**IV. CONCLUSION**

Based on the foregoing, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED IN PART** but **DENIED** with respect to the following two claims:

1. Plaintiff's claim that Monahan denied him a properly ventilated cell while in ADSEG.

2. Plaintiff's claim that Gallup retaliated against him by confiscating prisoner appliances telling the prisoners he was doing so because "plaintiff writes grievances."

As such it is recommended that Terrill and Andison be dismissed as parties to this lawsuit.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

*s/Mark A. Randon*
*MARK A. RANDON*
*UNITED STATES MAGISTRATE JUDGE*

*Dated: April 21, 2011*

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, April 21, 2011, by electronic and/or ordinary mail.*

*s/Melody R. Miles*
*Case Manager to Magistrate Judge Mark A. Randon*